WERDEGAR, J.,
Dissenting.—The court holds today that 592 plaintiffs residing in states other than California may sue Bristol-Myers Squibb Company (BMS) in a California superior court for injuries resulting from these plaintiffs’ *814 use in their own states of BMS’s prescription drug, Plavix. Because BMS is not incorporated or based in California, its activities in the state are insufficient to establish general personal jurisdiction—jurisdiction for disputes unrelated to the company’s California activities—over it in California courts. (Maj. opn., ante, at pp. 788-789.) The majority, however, finds BMS’s California contacts sufficient for specific, case-related personal jurisdiction, even though Plavix was not developed or manufactured in California and the nonresident plaintiffs did not obtain the drug through California physicians or from a California source, and despite the requirement for specific jurisdiction that there be a substantial connection between the plaintiff’s claim and the defendant’s forum activities. (Id. at pp. 799-807; see Vons Companies, Inc. v. Seabest Foods, Inc. (1996) 14 Cal.4th 434, 452 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (Vons).)
I respectfully dissent from the court’s decision on personal jurisdiction. I agree the extent and type of contacts to support general jurisdiction are lacking. But I find in the record no evidence of contacts with California that bear a substantial connection to the claims of these nonresidents. I therefore would hold specific jurisdiction has also not been established.
On a defendant’s motion to quash service of process, the plaintiff asserting jurisdiction bears the burden of proving the extent of the defendant’s forum contacts and their relationship to the plaintiff’s claims. (Vons, supra, 14 Cal.4th at p. 449; Gilmore Bank v. AsiaTrust New Zealand Ltd. (2014) 223 Cal.App.4th 1558, 1568 [168 Cal.Rptr.3d 525].) In this case, the nonresident plaintiffs (real parties in interest on BMS’s petition for writ of mandate) have failed to show any substantial nexus, causal or otherwise, between their claims and BMS’s activities in California.
One can imagine a number of factual circumstances that might justify specific jurisdiction in a case like this. Unfortunately, none of those circumstances have been established here:
If real parties in interest had purchased Plavix while in California or from a California source, their claims could be considered substantially related to BMS’s sale of Plavix in this state. But the record contains no evidence connecting the Plavix taken by any of the nonresident plaintiffs to California.
If real parties had been prescribed Plavix by a California doctor, their misrepresentation claims might be considered substantially related to BMS’s marketing of Plavix to physicians here. But there is no evidence of a California connection through real parties’ prescribing physicians.
*815 If the Plavix taken by real parties had been manufactured in California, one might well consider their defective product claims substantially connected to BMS’s forum contacts. But the record shows Plavix has never been manufactured in California.
If the Plavix taken by real parties had been distributed to their respective states by codefendant McKesson Corporation, which is headquartered in San Francisco, it could be argued real parties’ defective product claims were related to the distribution agreement between BMS and McKesson. But real parties have adduced no evidence to show how or by whom the Plavix they took was distributed to the pharmacies that dispensed it to them.
If Plavix had been developed in California, real parties’ defective product claims could be considered related to that California activity. But the record shows Plavix was developed not in California but in New York and New Jersey, where BMS has, respectively, its headquarters and major operating facilities.
If the labeling, packaging, or regulatory approval of Plavix had been performed in or directed from California, some of real parties’ misrepresentation claims would arguably be related to those California activities. But BMS did none of those things in California.
Finally, if the “nationwide marketing” campaign on which the majority relies (maj. opn., ante, at p. 806) had been created or directed from California, claims of misrepresentations in that marketing would have arisen from BMS’s California contacts. But according to the record, none of that marketing work was performed or directed by BMS’s California employees.
In the absence of a concrete factual relationship between their claims and BMS’s contacts with the forum state, on what do real parties, and the majority of this court, base their argument for specific jurisdiction over BMS in California courts? In brief, their argument rests on similarity of claims and joinder with California plaintiffs. First, real parties’ claims arise from activities similar to those BMS conducted in California, because in marketing and selling Plavix throughout the United States, BMS sold the same allegedly defective product in California as in real parties’ various states of residence and presumably made some of the same misrepresentations and omissions in those states and in California. Second, real parties are joined in this action with plaintiffs who are California residents and who allege similar claims. Neither of these factors, however, creates a connection between real parties’ claims of injury and BMS’s California activities sufficient to satisfy due process.
By statute, the personal jurisdiction of California courts extends to the limits set by the state and federal Constitutions. (Code Civ. Proc., § 410.10.) *816 Constitutional due process limits dictate that in the absence of general jurisdiction—which exists only if a corporation is incorporated in the forum state or conducts such intensive activities there as to make it “at home” in that state (Goodyear Dunlop Tires Operations, S.A. v. Brown (2011) 564 U.S. 915, 919 [180 L.Ed.2d 796, 131 S.Ct. 2846] (Goodyear))—personal jurisdiction over the corporation to adjudicate a particular claim (specific jurisdiction) is established only if the controversy “is related to or ‘arises out of’ ” the company’s activities in the forum state. (Helicopteros Nacionales de Colombia v. Hall (1984) 466 U.S. 408, 414 [80 L.Ed.2d 404, 104 S.Ct. 1868] (Helicopteros).)
The majority’s decision is not supported by specific jurisdiction decisions from the United States Supreme Court, this court, or the lower federal and state courts. (See pt. I, post.) And as I will discuss later (see pt. II, post), today’s decision impairs important functions of reciprocity, predictability, and limited state sovereignty served by the relatedness requirement. By weakening the relatedness requirement, the majority’s decision threatens to subject companies to the jurisdiction of California courts to an extent unpredictable from their business activities in California, extending jurisdiction over claims of liability well beyond our state’s legitimate regulatory interest.
Just as important, minimizing the relatedness requirement undermines an essential distinction between specific and general jurisdiction. In Daimler AG v. Bauman (2014) 571 U.S. 117, _ [187 L.Ed.2d 624, 630, 134 S.Ct. 746, 751], the United States Supreme Court made clear that general jurisdiction—jurisdiction to adjudicate controversies unrelated to the defendant’s forum contacts—is not created merely by commercial contacts that are “continuous and systematic” (Helicopteros, supra, 466 U.S. at p. 416) but only by contacts so extensive as to render the defendant “ ‘at home’ ” in the forum state. (Daimler, supra, 571 U.S. at p. _ [187 L.Ed.2d at p. 761].) The majority applies that holding to conclude, correctly, that general jurisdiction is lacking here. (Maj. opn., ante, at pp. 797-799.) But by reducing relatedness to mere similarity and joinder, the majority expands specific jurisdiction to the point that, for a large category of defendants, it becomes indistinguishable from general jurisdiction. At least for consumer companies operating nationwide, with substantial sales in California, the majority creates the equivalent of general jurisdiction in California courts. What the federal high court wrought in Daimler—a shift in the general jurisdiction standard from the “continuous and systematic” test of Helicópteros to a much tighter “at home” limit—this court undoes today under the rubric of specific jurisdiction.
*817 I. The Case Law Does Not Support Specific Jurisdiction in These Circumstances
Specific jurisdiction over a defendant—jurisdiction to adjudicate a dispute connected to the defendant’s contacts with the forum state—depends on the relationship among the defendant, the forum, and the litigation. (Helicopteros, supra, 466 U.S. at p. 414.) We have summarized the requirements for specific jurisdiction as threefold: (1) the defendant has purposefully availed itself of forum benefits; (2) the controversy arises out of or is otherwise related to the defendant’s forum contacts; and (3) the assertion of personal jurisdiction in the particular litigation is reasonable in light of the burdens and benefits of forum litigation. (Snowney v. Harrah ’s Entertainment, Inc. (2005) 35 Cal.4th 1054, 1062 [29 Cal.Rptr.3d 33, 112 P.3d 28] (Snowney).)
BMS contests neither the first prong of this tripartite test, that the company has purposefully availed itself of forum benefits by its continuous course of substantial business activities in California, nor the third, that taking jurisdiction would impose unreasonable burdens on the company. (Snowney, supra, 35 Cal.4th at p. 1070.) The key issue here is therefore whether the claims of the real parties in interest (plaintiffs residing in states other than California) arise out of, or are otherwise related to, BMS’s activities in California.
A. The Relatedness Requirement for Specific Jurisdiction
The requirement that the litigation be related to the defendant’s activities in or directed to the forum, by which it has purposefully availed itself of the benefits of doing business in the state, was first stated in the landmark decision of Internat. Shoe Co. v. Washington (1945) 326 U.S. 310 [90 L.Ed. 95, 66 S.Ct. 154] (International Shoe). The high court first noted that jurisdiction is well established when a corporation’s “continuous and systematic” activities in the state “give rise to the liabilities sued on.” (Id. at p. 317.) Even when a corporation has engaged in only occasional activities in the state, due process may still be satisfied if those activities have created the obligations sued on: “[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.” (Id. at p. 319.)
In International Shoe itself, the relationship between the forum activities and the litigation was a straightforward one: The defendant corporation had employed salesmen in the State of Washington, which required it contribute *818 to the state’s unemployment compensation fund; the litigation concerned an assessment for unpaid contributions. (International Shoe, supra, 326 U.S. at pp. 312-313.) Thus ‘“[t]he obligation which is here sued upon arose out of those very [forum] activities,” making it reasonable for Washington “to enforce the obligations which appellant has incurred there.” (Id. at p. 320.)
The United States Supreme Court has not, since International Shoe, greatly elaborated on its understanding of the relatedness requirement. The court in Helicópteros slightly reformulated the requirement: jurisdiction may be appropriate if the controversy “arise[s] out of or relate[s] to” the company’s forum contacts. (Helicopteros, supra, 466 U.S. at p. 414.) But the high court did not explain or apply that standard in Helicópteros, and in Goodyear, supra, 564 U.S. at page 919, the court again used a different formulation, suggesting a narrower vision of relatedness: “Specific jurisdiction . . . depends on an ‘affiliatio[n] between the forum and the underlying controversy,’ principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State’s regulation.” (Italics added.) The Goodyear court went on, very briefly, to explain why specific jurisdiction did not exist in the case before it, which involved the deaths of two North Carolina boys in an overseas bus accident: “Because the episode-in-suit, the bus accident, occurred in France, and the tire alleged to have caused the accident was manufactured and sold abroad, North Carolina courts lacked specific jurisdiction to adjudicate the controversy.” (Ibid.) None of the injury-causing events having occurred in the forum state, the basis for specific jurisdiction was lacking.
Of the post-International Shoe decisions in which the high court actually found a factual basis for specific jurisdiction, each featured a direct link between forum activities and the litigation. (See Burger King Corp. v. Rudzewicz (1985) 471 U.S. 462, 479-480 [85 L.Ed.2d 528, 105 S.Ct. 2174] [specific jurisdiction in Florida courts proper where franchise dispute “grew directly out of’ contract formed between Florida franchisor and Michigan franchisee, whose breach “caused foreseeable injuries to the corporation in Florida”]; Calder v. Jones (1984) 465 U.S. 783, 789 [79 L.Ed.2d 804, 104 S.Ct. 1482] [California jurisdiction over writer and editor based in Florida proper for article distributed in California and defaming California resident, where the defendants’ “intentional, and allegedly tortious, actions were expressly aimed at California” and they knew article “would have a potentially devastating impact” on California resident]; Keeton v. Hustler Magazine, Inc. (1984) 465 U.S. 770, 776-777 [79 L.Ed.2d 790, 104 S.Ct. 1473] (Keeton) [specific jurisdiction in New Hampshire courts proper over Ohio corporation where corporation’s sale in New Hampshire of magazine defaming the plaintiff injured her reputation in that state]; McGee v. International Life Ins. Co. (1957) 355 U.S. 220, 223 [2 L.Ed.2d 223, 78 S.Ct. 199] [specific jurisdiction in California courts proper where action was based on a *819 life insurance contract delivered in California and on which the insured, a California resident at his death, had paid premiums from the state].) Nothing in the high court’s specific jurisdiction decisions suggests an abandonment or broad relaxation of the relatedness requirement.
This court did, in Vons, adopt a relatively broad standard for relatedness. After canvassing formulations put forward by scholars and lower courts, we held the relationship between the defendant’s forum contacts and the plaintiff’s claims in litigation need not be one of proximate legal causation or even “but for” factual causation, nor need the forum contacts be substantively relevant in the plaintiff’s action. (Vons, supra, 14 Cal.4th at pp. 460-75.) Rather, the relationship required for specific jurisdiction exists if the claims bear a “substantial nexus or connection” to the activities by which the defendant has purposefully availed itself of forum benefits. (Id. at p. 456; accord, Snowney, supra, 35 Cal.4th at pp. 1067-1068.) The test is not a mechanical one, but a weighing process in which “the greater the intensity of forum activity, the lesser the relationship required between the contact and the claim.” (Vons, supra, at p. 453; accord, Snowney, supra, at p. 1068.) Specific jurisdiction in California courts is proper if “because of the defendants’ relationship with the forum, it is not unfair to require that they answer in a California court for an alleged injury that is substantially connected to the defendants’ forum contacts.” (Vons, supra, at p. 453.)
Notwithstanding our relatively broad substantial connection standard, mere similarity of claims is an insufficient basis for specific jurisdiction. The claims of real parties in interest, nonresidents injured by their use of Plavix they purchased and used in other states, in no sense arise from BMS’s marketing and sales of Plavix in California, or from any of BMS’s other activities in this state. Nor is any other substantial connection apparent.
BMS promoted and sold Plavix in this state, giving rise to the California plaintiffs’ claims. BMS also engaged in such promotion and sales in many other states, giving rise to claims by residents of those states. As all the claims derive from similar conduct and allege similar injuries, the nonresident plaintiffs’ claims closely resemble those made by California residents. But I can perceive no substantial nexus between the nonresidents’ claims and BMS’s California activities. In each state, the company’s activities are connected to claims by those who obtained Plavix or were injured in that state, but no relationship other than similarity runs between the claims made in different states. As BMS argues, its California contacts fail to “intersect” with the nonresident plaintiffs’ claims.
Even a commentator “sympathetic to an expanded role for specific jurisdiction” found the approach of the Court of Appeal in this case, which the *820 majority in this court largely replicates, so overly broad as “to reintroduce general jurisdiction by another name.” (Silberman, The End of Another Era: Reflections on Daimler and Its Implications for Judicial Jurisdiction in the United States (2015) 19 Lewis & Clark L.Rev. 675, 687 (hereafter Silberman).) “A more plausible specific jurisdiction forum might be the state where the drugs were manufactured or distributed to both the California and non-California plaintiffs; all plaintiffs’ claims might be said to ‘arise from’ such defective manufacture and thereby provide an alternative single forum in which to have all the plaintiffs assert their claims. In Bristol-Meyers \sic\. no such connection to California can be established for the non-California plaintiffs. The claims of the California and nonresident plaintiffs are merely parallel.” (Ihid., fn. omitted.)
One form of substantial connection between a defendant’s forum activities and the claims against it exists when the forum activities are legally relevant to establish the claims. (Vons, supra, 14 Cal.4th at p. 469.) In that situation, the forum state’s interest in regulating conduct occurring within its borders is implicated, as the plaintiff is seeking to impose liability, at least in part, for acts the defendant committed in the forum state. (Id. at p. 472.) But no such legal relevance connection is apparent here. The nonresident plaintiffs’ claims rest on allegations that BMS deceptively marketed and sold Plavix to them or their prescribing physicians, but, as noted earlier, the record is devoid of any suggestion, nor do real parties claim, the nonresident plaintiffs bought or were prescribed Plavix from a California source. BMS’s marketing and sales activities in California thus appear irrelevant to real parties’ claims. To quote BMS’s brief, the nonresident plaintiffs’ claims “would be exactly the same if BMS had never set foot in California, had never engaged in any commercial activity in California, had never sold any product here, and had engaged only non-California distributors.”
In addition to its interest in regulating conduct within its borders, each state has an interest in providing a judicial forum for its injured residents, regardless of whether the conduct sued on occurred in the state. (Vons, supra, 14 Cal.4th at pp. 472-473.) “[T]he state has a legitimate interest as sovereign in providing its residents with protection from injuries caused by nonresidents and with a forum in which to seek redress. This assertion of sovereignty with respect to nonresident defendants is fair when those defendants have availed themselves of certain benefits within the state and the claim is related to those contacts.” (Id. at p. 473.) But reference to the state’s interest in providing a forum for its residents to seek legal redress is of no help to real parties in interest here, as they are not California residents. California has no discern-able sovereign interest in providing an Ohio or South Carolina resident a forum in which to seek redress for injuries in those states caused by conduct occurring outside California. A mere resemblance between the nonresident *821 plaintiffs’ claims and those of California residents creates no sovereign interest in litigating those claims in a forum to which they have no substantial connection.
The majority argues that taking jurisdiction over the nonresidents’ claims furthers a California interest because evidence of their injuries may be admissible to help the California plaintiffs prove Plavix was a defective product. (Maj. opn., ante, at p. 810.) But admissibility of other injuries does not depend on joinder of the other injured person, as the cases the majority cites illustrate. In neither Ault v. International Harvester Co. (1974) 13 Cal.3d 113 [117 Cal.Rptr. 812, 528 P.2d 1148] nor Elsworth v. Beech Aircraft Corp. (1984) 37 Cal.3d 540 [208 Cal.Rptr. 874, 691 P.2d 630], where evidence of prior similar injuries was held admissible, were those injured in the prior accidents joined as parties in the action.
The majority also suggests that jurisdiction over the nonresidents’ claims is proper because California law attempts to “protect[] consumers from the potential dangers posed by prescription medication.” (Maj. opn., ante, at p. 810.) The statutes cited, however, regulate the dispensing of prescription drugs by California pharmacists (Bus. & Prof. Code, §§ 4()7(Mf)78), while the claims at issue in this case are against BMS, a drug manufacturer. Moreover, real parties in interest have neither alleged nor proven they were prescribed or furnished Plavix in California. How the cited California laws might apply to their claims is thus unclear, to say the least.
In the same passage, the majority implies that the activity of BMS’s California sales representatives, whose representations California has an interest in regulating, might somehow be related to real parties’ claims. (Maj. opn., ante, at p. 810.) In this instance as well, the majority ignores the complete absence of evidence showing any such relationship. Real parties in interest, who have the burden of proving forum contacts related to their claims, have not even attempted to establish that sales representatives in California misled physicians in other states about Plavix’s efficacy and safety. While no doubt correct California has an interest in regulating dangerous conduct within our state (maj. opn, ante, p. 810, fn. 6), the majority neglects to explain how that interest can be served by taking jurisdiction to adjudicate the claims of persons unaffected by any such conduct.
Finally, the majority asserts that California’s interest in regulating the conduct of codefendant McKesson Corporation (McKesson), a pharmaceutical distributor headquartered in California, justifies adjudicating real parties’ claims against BMS in a California court. (Maj. opn., ante, at p. 811.) Of all the majority’s red herrings, this is perhaps the ruddiest. Why plaintiffs sued McKesson as well as BMS is not obvious—BMS suggests it was merely *822 to avoid removal to federal court (see 28 U.S.C. § 1441(b)(2))—but at no point have real parties argued McKesson bore any responsibility in providing them with Plavix. In their brief on the merits, real parties contended BMS’s relationship with McKesson helped BMS make substantial profits “within California,” and at oral argument their attorney acknowledged he had no evidence tying McKesson to the Plavix that allegedly injured real parties outside this state. The notion of a connection between McKesson’s conduct in California and the claims of real parties in interest, which arise from their acquisition and use of Plavix in other states, is purely a product of the majority’s imagination.
Notwithstanding the majority’s speculative suggestions, as far as the record shows real parties’ claims arise solely from conduct in other states and do not implicate California’s legitimate interest in regulating conduct within its borders.
B. Jurisdiction Over Liability Claims for Pharmaceutical Drugs
Neither real parties in interest nor the majority cites any decision, state or federal, finding specific jurisdiction on facts similar to those here. In fact, courts in both systems have rejected jurisdiction over drug defect claims made by plaintiffs who neither reside in nor were injured by conduct in the forum state.
In Boaz v. Boyle & Co. (1995) 40 Cal.App.4th 700 [46 Cal.Rptr.2d 888] (Boaz), a group of plaintiffs, mostly residents of New York and New Jersey, but including one California resident, sued several manufacturers of the drug DES for injuries allegedly resulting from their grandmothers’ ingestion of the drug in New York. (Id. at p. 704.) The appellate court affirmed the dismissal of the action against defendant Emons Industries, Inc., which was not subject to California’s general jurisdiction, holding the basis for specific jurisdiction was also lacking as the defendant’s activities in California were unrelated to the plaintiffs’ injuries. (Id. at p. 705.) “It is conceded that none of appellants’ grandmothers, who ingested DES, did so in California. Nor did any of them acquire the product as the result of any of Emons’s activities related to California. Indeed, as we have seen, none of them except [the single California resident] has any connection with this state.” {Id. at p. 718.) Though the defendant had sold DES in California as it had in other states, that similarity of conduct did not subject it to personal jurisdiction for the purposes of adjudicating the out-of-state plaintiffs’ claims, though, as the court noted, jurisdiction might be appropriate “in a case arising out of *823 ingestion in California or by purchase or prescription in California of DES.” {Id. at p. 721.)[1] As in the present case, none of those facts had been or could be established.
Glater v. Eli Lilly & Co. (1st Cir. 1984) 744 F.2d 213, presented a similar fact pattern in an individual suit. The plaintiff there sued a DES manufacturer in a federal court in New Hampshire for injuries she allegedly suffered from in útero exposure to the drug. The plaintiffs mother took the drug in Massachusetts, where she lived. {Id. at p. 214.) That the manufacturer had marketed DES nationwide, including in New Hampshire, was insufficient to support specific jurisdiction: Although Lilly marketed and sold DES nationwide, including in New Hampshire, “'Glater’s cause of action did not arise from Lilly’s New Hampshire activities; rather, her injuries were caused in Massachusetts by exposure in útero to DES which her mother purchased and consumed in Massachusetts.” {Id. at p. 216.) Were the defendant’s New Hampshire contacts deemed sufficiently related to the cause of action arising in Massachusetts, the court “would be obliged to hold that any plaintiff in Glater’s position—a nonresident injured out of state by a drug sold and consumed out of state—could bring suit in New Hampshire for DES injuries.” (Id. at p. 216, fn. 4.) Such “retributive jurisdiction” over claims unconnected to the forum “comports with neither logic nor fairness.” (Ibid.; accord, Seymour v. Parke, Davis & Co. (1st Cir. 1970) 423 F.2d 584, 585, 587 [suit in New Hampshire over drug taken and allegedly causing injury in Massachusetts “did not arise [in New Hampshire], or as a result of anything which occurred there” and hence was an “unconnected cause[] of action” that could only be justified by general jurisdiction, the basis for which was also lacking].)
Also similar, though less extensively reasoned as to specific jurisdiction, is Ratliff v. Cooper Laboratories, Inc. (4th Cir. 1971) 444 F.2d 745. That decision addressed two consolidated cases brought in a federal court in South Carolina, both by residents of other states who bought and consumed the allegedly harmful drugs (not named in the decision), against drug manufacturers that conducted business in South Carolina but were not incorporated or *824 headquartered there and had not made the subject drugs there. {Id. at p. 746.) The court observed that the plaintiffs were not residents of South Carolina and their causes of action “arose outside the forum and were unconnected with the defendant’s activities in South Carolina.” {Id. at p. 747.) Noting “the lack of a ‘rational nexus’ between the forum state and the relevant facts surrounding the claims presented” such as would support specific jurisdiction, the court moved on to general jurisdiction (for which it also found the forum contacts insufficient). {Id. at p. 748.)
In all these cases, the defendants had sold their pharmaceutical drugs in the forum state. Indeed, in Boaz, California physicians accounted for 9 percent of the defendant’s DES sales. (Boaz, supra, 40 Cal.App.4th at p. 715.)[2] Yet these courts—correctly, in my view—considered that forum activity to be unconnected to the plaintiffs’ claims, which arose from use of the drugs in other states. Not until today’s decision has specific jurisdiction over a drug liability claim arising from the nonresident plaintiff’s purchase, use, and injury outside the forum state been premised on the fact that the defendant also sold the drug in the forum state.
C. Specific Jurisdiction Decisions Relied on by Reed Parties
Turning from pharmaceutical liability to the broader case law, we see that none of the decisions real parties cite support specific jurisdiction based, as here, on the mere resemblance between the disputed claims and distinct claims brought by other plaintiffs that arose from the defendant’s forum contacts. Each of these cited cases involved a substantial connection between the defendant’s activities in the forum state and the plaintiff’s claims, not merely a connection between the forum activities and similar claims made by other plaintiffs.
In Cornelison v. Chaney (1976) 16 Cal.3d 143 [127 Cal.Rptr. 352, 545 P.2d 264] (Cornelison), a California resident sued for the wrongful death of her husband, who died in an automobile accident in Nevada. The defendant, a Nebraska resident, was a trucker hauling goods in interstate commerce. He made approximately 20 trips to California each year and was en route to this state with a shipment when his truck collided with the decedent’s vehicle in Nevada, near the California border. {Id. at pp. 146-147.)
*825 We concluded the plaintiffs cause of action did bear a substantial connection to the defendant’s business activities in California: “As we have seen, defendant has been engaged in a continuous course of conduct that has brought him into the state almost twice a month for seven years as a trucker under a California license. The accident occurred not far from the California border, while defendant was bound for this state. He was not only bringing goods into California for a local manufacturer, but he intended to receive merchandise here for delivery elsewhere. The accident arose out of the driving of the truck, the very activity which was the essential basis of defendant’s contacts with this state. These factors demonstrate, in our view, a substantial nexus between plaintiff’s cause of action and defendant’s activities in California.” (Cornelison, supra, 16 Cal.3d at p. 149.) In further support, we observed that California had an interest in providing a forum for the litigation because the plaintiff was a California resident. (Id. at p. 151.)
Cornelison has in common with the present case that the plaintiff’s injury arose directly from the defendant’s conduct outside California. But in Cornelison the defendant’s out-of-state conduct, his allegedly negligent driving in Nevada, was directed (literally) toward California and resulted in injury to a California resident. The connections to California that justified jurisdiction in Cornelison are missing from the claims of real parties in interest here.
In Vons, supra, 14 Cal.4th 434, we held specific jurisdiction proper over two restaurant franchisees based and operating in Washington State. In multiparty litigation arising out of food poisoning incidents at their and other Jack-in-the-Box restaurants, the supplier of the allegedly tainted meat (Vons Companies, Inc. (Vons)) cross-complained against several franchisees, including the Washington franchisees, alleging their failure to cook the meat properly caused the poisoning. (Id. at pp. 440-441.) Among other contacts with California, the franchisees had executed the franchise agreements, which specified methods of preparing Jack-in-the-Box food products, in California, did regular business with the franchisor at its headquarters in San Diego, and had officers attend training sessions offered by the franchisor in California. (Id. at pp. 442-443.)
We held Vons’s claims against the franchisees bore a substantial relationship to their contacts with California for two reasons: first, the franchise relationship—formed in California, under which the franchisees bought meat Vons supplied to the franchisor—had drawn Vons and the franchisees into a relationship as alleged joint tortfeasors, with certain joint liabilities and rights of indemnification, rights upon which Vons’s cross-complaint in part rested; second, the franchise relationship, by imposing uniform standards for cooking food, buying equipment, and training employees, was itself an alleged source *826 of Vons’s injuries, which Vons traced to the “ ‘systematically deficient’ ” procedures required by the franchisor. (Vons, supra, 14 Cal.4th at pp. 456-457.)
Real parties in interest rely on Vons for the propositions that for specific jurisdiction to be justified the defendant’s forum activities need not be directed at the plaintiff or directly give rise to the plaintiff’s claims. (See Vons, supra, 14 Cal.4th at pp. 453, 457.) Both points are well taken. Nonetheless, in Vons the connection between the forum activities and the claim was far more substantial than in the present case. By their activities in California, including the formation of franchise relationships, the franchisees in Vons established the conditions that would ultimately allow the franchisor’s meat supplier, Vons, to seek indemnity for their joint liability and redress for its own injuries. The franchisees’ forum activities were not directed at Vons, with which they had no direct relationship, and may not have proximately given rise to Vons’s claims, but by establishing a franchise relationship pursuant to which the franchisees bought Vons’s meat and prepared it according to methods set out in the franchise agreement, they set the stage for those claims, to say the least. No such nexus is apparent here, where BMS’s marketing and sales of Plavix in California did nothing to establish the circumstances under which it allegedly injured plaintiffs in other states.
Finally as to California cases, real parties in interest cite Snowney, supra, 35 Cal.4th 1054, in which we held a California resident could sue a group of Nevada hotels in a California court for the hotels’ failure to provide notice that they would impose an energy surcharge on their room prices. (Id. at p. 1059.) In a relatively brief discussion of the relatedness issue (the bulk of our analysis concerned the question of purposeful availment), we held the plaintiff’s claims had a substantial connection to the defendants’ California forum activities because the plaintiff’s false advertising and unfair competition claims were based on the hotels’ alleged omissions in their California advertising and in the reservation process. (Id. at p. 1068.) “Because the harm alleged by plaintiff relates directly to the content of defendants’ promotional activities in California, an inherent relationship between plaintiff’s claims and defendants’ contacts with California exists.” (Id. at p. 1069.)
Real parties rely on Snowney for its adherence to the substantial connection test articulated in Vons and for its reiteration of Vans's statements that the required intensity of forum contacts and connection of the claim to those contacts are inversely related (the greater the contacts, the less of a relationship need be shown) and that the forum contacts need not be directed at the plaintiff or give rise directly to the plaintiff’s claim. (See Snowney, supra, 35 Cal.4th at p. 1068.) I find those principles unavailing in this case. However intense the defendant’s activities in California, they must still bear a substantial relationship to the plaintiff’s claims, and neither Snowney nor any of the *827 other decisions real parties cite suggests that a mere resemblance between the plaintiffs claims and those made by other plaintiffs that are based on the defendant’s California contacts establishes a substantial connection.
Comelison, Vons and Snowney establish that we do not demand the relationship between the defendant’s California contacts and the plaintiff’s claims be causal or direct. They do not, however, support specific jurisdiction on the tenuous basis of a resemblance to other claims by other plaintiffs. (See Greenwell v. Auto-Owners Ins. Co. (2015) 233 Cal.App.4th 783, 801 [182 Cal.Rptr.3d 873] [Vons and Snowney require a substantial connection between the plaintiff’s claims and the defendant’s forum contacts; test is not satisfied whenever there is “any relationship at all”].)
In Keeton, supra, 465 U.S. 770, the United States Supreme Court upheld the assertion of specific jurisdiction in New Hampshire to adjudicate the libel claims of a New York resident against an Ohio corporation with its principal place of business in California. {Id. at pp. 772-774.) The high court found the defendant’s regular circulation of magazines in New Hampshire was sufficient to support the state’s jurisdiction over a libel claim based on the magazine’s contents, even though the plaintiff could, under the “ ‘single publication rule’ ” followed in New Hampshire, recover damages from publication of the magazine throughout the United States. {Id. at pp. 773-774.) The court emphasized that the plaintiff was suing, in part, for damages she suffered in New Hampshire, “[a]nd it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State.” {Id. at p. 776.)
Unlike the plaintiff in Keeton, real parties in interest suffered no injury in California or from BMS’s conduct in California. They nonetheless argue Keeton is analogous because the plaintiff there sought recovery, in large part, for injuries incurred outside the forum state. For two reasons, however, the analogy does not hold.
First, the single publication rule at work in Keeton was a state law rule governing the measure of damages for defamation, not one governing the joinder of claims or claimants. The propriety of that state law damages rule was not itself a jurisdictional issue; rather, the question was whether personal jurisdiction in New Hampshire violated due process given the state’s single publication rule (and its unusually long statute of limitations). (Keeton, supra, 465 U.S. at pp. 773-774.) In contrast, BMS’s motion to quash service of summons as to the claims of the nonresident plaintiffs directly presents the jurisdictional issue as to those plaintiffs. We ask whether the superior court may take jurisdiction over defendant to adjudicate those claims, and are not required to decide whether the entire suit, including the claims of the *828 California residents, would be subject to dismissal for lack of jurisdiction if the nonresidents’ claims were included in it.
Second, New Hampshire had an interest in adjudicating the out-of-state damages that does not translate to the factual context of this case. (See Keeton, supra, 465 U.S. at p. 777.) To prevent the extraordinary burden on courts and litigants of having a defamation plaintiff sue separately in 50 states—and to allow effective application of a statute of limitations for publications that continue or recur over lengthy periods—most states have adopted the single publication rule, allowing only a single action per publication, but one in which all damages from the publication may be recovered. (See Civ. Code, § 3425.3 [Uniform Single Publication Act]; Christoff v. Nestlé USA, Inc. (2009) 47 Cal.4th 468, 477-479 [97 Cal.Rptr.3d 798, 213 P.3d 132]; see also Keeton, supra, at p. 778.)
On the facts of this case, there is no analogous state interest of similar force that would justify California courts adjudicating the nonresident plaintiffs’ claims. This is not a case in which the individual California plaintiffs would be stymied by procedural obstacles or restrictive damages rules were the nonresidents excluded from the action. Plaintiffs allege they suffered “severe physical, economic and emotional injuries” from their use of Plavix, including bleeding ulcers, gastrointestinal bleeding, cerebral bleeding, heart attack and stroke. Even if some of the California plaintiffs might have individual claims too small to justify suit, the consolidation of scores of such claims from within California would remedy that insufficiency without the addition of hundreds of nonresidents’ claims. California can thus provide an effective forum for its residents to seek redress without joining those claims to similar claims by nonresidents. Nor does this case raise the specter of a continually restarting statute of limitations that would subject defendants like BMS to the harassment of unending suits for the same conduct (see Christoff v. Nestlé USA, Inc., supra, 47 Cal.4th at p. 478), as was the case with the defamation suit in Keeton.
The majority argues jurisdiction over nonresidents’ claims is justified by the efficiencies of litigating all claims arising from a “mass tort” in a single forum and by the existence of a complex litigation division in San Francisco Superior Court “well suited to expeditiously handle such large cases.” (Maj. opn., ante, at pp. 812, 811.) If these 678 plaintiffs were all the injured Plavix users in the United States, and the only options for the nonresident plaintiffs were participation in this action or individual actions in their home states, then joint proceedings in California would likely be the most efficient procedure, though the extent of that efficiency would depend on how choice of law questions are resolved, among other factors. (See Silberman, supra, 19 Lewis & Clark L.Rev. at p. 687 [“As for the efficiency arguments relied on *829 by the California appeals court, only the issue of the defective quality of the drug is common to all the claims.”].)
But these plaintiffs do not constitute the entire universe of those claiming injury from Plavix—far from it—and real parties’ options are not limited to joining this action or each bringing separate actions in their respective states. In addition to consolidated multidistrict federal litigation in the District of New Jersey, individual, mass or representative actions have been brought in several other states.[3] Whether or not real parties’ claims are heard together with those of the California plaintiffs, inefficiency and the potential for conflicting rulings will exist so long as actions are simultaneously pending in several state and federal courts. (See generally Miller, Overlapping Class Actions (1996) 71 N.Y.U. L.Rev. 514, 520-525.)
No mechanism exists for centralizing nationwide litigation in a state court; there is no means by which pending actions in Illinois courts, for example, can be transferred to a California court. The San Francisco Superior Court, no matter how well equipped for trying complex cases, cannot adjudicate the entire dispute between injured Plavix users and BMS. If efficiency is the goal, federal litigation centralized through the multidistrict procedure offers a more promising path than a series of uncoordinated state and federal court actions.
Keeton, in which jurisdiction was found proper despite a state law rule allowing damages for out-of-state injuries, thus fails to support real parties’ contention that jurisdiction over litigation brought by nonresident plaintiffs whose claims arose in other states may be obtained by joining their cases to similar ones brought by California plaintiffs. Such jurisdiction by joinder, moreover, would run counter to the holding of Hanson v. Denckla (1958) 357 U.S. 235 [2 L.Ed.2d 1283, 78 S.Ct. 1228] (Hanson).
*830 In Hanson, the high court held a Florida court considering the validity of a trust created in Delaware did not have personal jurisdiction over the Delaware trustee, who had performed no relevant acts in Florida (Hanson, supra, 357 U.S. at p. 252),[4] even though other parties to the dispute resided in Florida and could be brought before the Florida court: “It is urged that because the settlor and most of the appointees and beneficiaries were domiciled in Florida the courts of that State should be able to exercise personal jurisdiction over the nonresident trustees. This is a non sequitur. With personal jurisdiction over the executor, legatees, and appointees, there is nothing in federal law to prevent Florida from adjudicating concerning the respective rights and liabilities of those parties. But Florida has not chosen to do so. As we understand its law, the trustee is an indispensable party over whom the court must acquire jurisdiction before it is empowered to enter judgment in a proceeding affecting the validity of a trust. It does not acquire that jurisdiction by being the ‘center of gravity’ of the controversy, or the most convenient location for litigation.” {Id. at p. 254, fn. omitted.)
It is likewise a non sequitur to argue that because many Californians have sued BMS for injuries allegedly caused by their use of Plavix, and the superior court’s jurisdiction to address their claims is not disputed, the claims of nonresidents injured in other states should also be adjudicated here. California might or might not be an especially convenient and efficient forum for nationwide Plavix litigation, but joinder of California plaintiffs cannot confer personal jurisdiction over BMS to adjudicate claims that do not arise out of, and are not otherwise related to, BMS’s business activities in California.
The majority posits two bases for deeming BMS’s California activities related to the nonresident plaintiffs’ claims. First, despite a silent factual record on this point, the majority infers that BMS employed the “same . . . assertedly misleading marketing and promotion” in California as in the states where real parties resided and were allegedly injured.[5] (Maj. opn., ante, at p. 804.) I have shown above that neither the case law nor an analysis of *831 forum state interests supports basing specific jurisdiction on a similarity between activities in the forum state and those outside the forum. Characterizing BMS’s multistate marketing activities as “coordinated” (maj. opn., ante, at p. 804) adds nothing to the jurisdictional argument given that, as the majority concedes, the record shows BMS’s marketing campaign for Plavix was coordinated from New York and New Jersey rather than from California. The majority’s supposition that California courts have personal jurisdiction over an out-of-state defendant to adjudicate a claim arising from deceptive advertising in, say, Maryland because the defendant used a common marketing strategy in California, Maryland and other states is without rational foundation.
Nor does calling BMS’s nationwide marketing of Plavix a “course of conduct” (maj. opn., ante, at pp. 804, 806, 813) advance the majority’s cause. As already noted (fn. 5, ante), real parties introduced no evidence of marketing materials or broadcasts used in any state. Other than that some degree of commonality existed, which BMS conceded, the extent of marketing overlap among the states is simply unknown. Certainly, this record provides no basis for assuming that real parties and the California plaintiffs were all injured by a single television broadcast made simultaneously in every media market or a single print advertisement published simultaneously in newspapers and magazines throughout the nation. This is not a case, that is to say, of a single act injuring plaintiffs in multiple states at one blow, where the argument for common jurisdiction might be stronger. All that appears is that Plavix was marketed nationwide and that BMS may have used many of the same materials—none of them generated in California—in various states. Such similarity of causes is not sufficient to give our courts jurisdiction over all claims, wherever they arise, based on misrepresentations or omissions in a company’s marketing materials.
Second, the majority notes that BMS maintains some research facilities in California, although the majority concedes Plavix was not developed in those facilities.[6] (Maj. opn., ante, at p. 804.) This second ground of relatedness is both illogical and startling in its potential breadth. Because BMS has performed research on other drugs in California, claims of injury from Plavix may, according to the majority, be adjudicated in this state. Will we in the next case decide that a company may be sued in California for dismissing an employee in Florida because on another occasion it fired a different employee in California, or that an Illinois resident can sue his automobile insurer here *832 for bad faith because the defendant sells health care policies in the California market? The majority points to no substantial connection between Plavix claims arising in other states and research on unspecified other products in this state.
II. The Relatedness Requirement Serves Important Functions and Should Not Be Minimized
As shown in part I, ante, the case law on specific jurisdiction does not support a California court taking jurisdiction over nonresident plaintiffs’ claims, arising from their use of Plavix in other states. BMS marketed and sold Plavix to other plaintiffs within California, but those forum activities are not substantially related to the nonresident plaintiffs’ claims. In the absence, however, of any United States Supreme Court decisions closely on point, stare decisis does not prevent the majority from giving the relatedness requirement scant consideration, while relying on its theory that the asserted benefits of consolidating multistate claims in California outweigh the burdens for BMS of defending real parties’ claims here together with those of the California plaintiffs. (Maj. opn., ante, at pp. 808-812.) Nevertheless, this approach is, in my view, a serious mistake. By essentially ignoring relatedness and merely satisfying itself that defendant is not being haled into an inconvenient forum where it has no significant contacts, the majority blurs the distinction between general and specific jurisdiction and impairs the values of reciprocity, predictability, and interstate federalism served by due process limits on personal jurisdiction.
Reciprocity, in this context, refers to the idea that the litigation to which a defendant is exposed in a particular forum should bear some relationship to the benefits the company has sought by doing business in the state. (See Moore, The Relatedness Problem in Specific Jurisdiction (2001) 37 Idaho L.Rev. 583, 599 [“ ‘The party has garnered the benefits offered by the government in which the court sits. These benefits include the laws, the administrative framework and their restraining effects. In return, the party concedes to that government a quantum of power to govern his conduct, a power which he himself holds in a natural autonomous state.’ ”].) Such reciprocity is most clearly maintained by the state taking jurisdiction over disputes arising directly from the defendant’s activities in the state. As the high court said in International Shoe, where “[t]he obligation which is . . . sued upon arose out of those very activities,” it will generally be ‘“reasonable and just... to permit the state to enforce the obligations which appellant has incurred there.” (International Shoe, supra, 326 U.S. at p. 320.)
More broadly, enforcing a meaningful relatedness requirement ensures some degree of reciprocity; because the forum’s assertion of jurisdiction *833 cannot encompass disputes that have no substantial connection with the defendant’s forum activities, the liabilities to which the defendant is exposed in the forum will tend to bear a relationship to the benefits it has sought in doing business there. “Relationship helps test whether the benefits and burdens are similar. When a suit concerns the activities from which the corporation received in-state benefits, there is some similarity in the burden imposed by the assertion of jurisdiction. . . . Relatedness may be a rough measure, but it placed a logical limit on the burdens arising from in-state activities.” (Andrews, The Personal Jurisdiction Problem Overlooked in the National Debate About “Class Action Fairness’’ (2005) 58 SMU L.Rev. 1313, 1345-1346 (hereafter Andrews).)
Relatedness bears on predictability in much the same way. “In order for a business to properly structure its behavior—set consumer costs, procure insurance, or sever its relationship with a particular state—it must not only know that a contact has been made in a particular state (an aim protected through the purposeful availment standard), but it also must have some minimal appreciation of the effect of that contact. The relationship standard helps give this knowledge. If a business entity chooses to enter a state on a minimal level, it knows that under the relationship standard, its potential for suit will be limited to suits concerning the activities that it initiates in the state.” (Andrews, supra, 58 SMU L.Rev. at p. 1346; see World-Wide Volkswagen Corp. v. Woodson (1980) 444 U.S. 286, 297 [62 L.Ed.2d 490, 100 S.Ct. 559] (World-Wide Volkswagen) [observing that when a corporation sells its products in a state, “it has clear notice that it is subject to suit there,” and jurisdiction over a suit would not be unreasonable “if its allegedly defective merchandise has there been the source of injury to its owner or to others.”].)
Finally, limiting specific jurisdiction to litigation that is substantially connected to the defendant’s forum activities prevents states from straying beyond their legitimate regulatory spheres. Appropriately limited, specific jurisdiction “acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.” (World-Wide Volkswagen, supra, 444 U.S. at p. 292.) As the high court explained in Hanson, the growth in interstate commerce and the easing of communications and transportation may have tempered, but they have not eliminated, the role that territorial limits on state regulation play under due process. Due process restrictions on personal jurisdiction “are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.” (Hanson, supra, 357 U.S. at p. 251.)
Expanding on this point in World-Wide Volkswagen, the court explained that while the Constitution’s Framers foresaw a nation of economically *834 interdependent states, they “also intended that the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment.” (World-Wide Volkswagen, supra, 444 U.S. at p. 293.) Thus even in the modern era due process limits on personal jurisdiction retain a territorial aspect: “Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment.” (Id. at p. 294; accord, J. McIntyre Machinery, Ltd. v. Nicastro (2011) 564 U.S. 873, 879 [180 L.Ed.2d 765, 131 S.Ct. 2780] (plur. opn. of Kennedy, J.) [“The Due Process Clause protects an individual’s right to be deprived of life, liberty, or property only by the exercise of lawful power. . . . This is no less true with respect to the power of a sovereign to resolve disputes through judicial process than with respect to the power of a sovereign to prescribe rules of conduct for those within its sphere.”].)[7]
The relatedness requirement for specific jurisdiction plays a key role in implementing these interstate federalism limits. By conducting business within a state or directing its efforts at the state, a company brings its activities within the state’s core regulatory concerns. Litigation that arises from those activities falls squarely within the state’s sovereign power to adjudicate. In contrast, litigation arising outside the state is unlikely to be a fit subject for state court adjudication except to the extent it involves state residents. “A state has sovereignty with regard to activity conducted within its borders, and it thus has power over claims arising from that activity. ... A state seemingly has no sovereignty over activity that neither involves its citizens nor occurs within its borders.” (Andrews, supra, 58 SMU L.Rev. at p. 1347.) Relatedness thus “helps limit the reach of states so that they do not exceed legitimate state interests.” (Id. at p. 1348.) As this court remarked (in a choice of law discussion, but with equal applicability to jurisdiction), our state’s legitimate regulatory interest does not ordinarily extend to measures aimed at “altering] a defendant’s conduct in another state vis-a-vis another *835 state’s residents.” (Kearney v. Salomon Smith Barney, Inc. (2006) 39 Cal.4th 95, 104 [45 Cal.Rptr.3d 730, 137 P.3d 914], italics omitted.)
Basing specific jurisdiction on mere similarity between a corporation’s forum activities and those outside the state, as the majority does in this case, defeats the relatedness requirement’s functions of reciprocity, predictability, and interstate federalism. If BMS must answer in a California court for Plavix claims arising across the country simply because some Californians have made similar claims, the link between the benefits BMS has sought by doing that business in the state and the liabilities to which it is exposed here has been severed. In the same way, predictability has been severely impaired, as the company’s potential liabilities cannot be forecast from its state activities. And interstate federalism is perhaps most directly impaired; by taking jurisdiction to adjudicate a dispute arising only from BMS’s actions in, for example, Texas, and allegedly resulting in injuries only to a Texan, the California courts infringe directly on Texas’s sovereign prerogative to determine what liabilities BMS should bear for actions in its borders and injuring its residents. “[T]he forum state arguably exceeds its sovereignty when it asserts jurisdiction over claims that are merely similar to activities within its borders, as opposed to causally connected to the forum conduct.” (Andrews, supra, 58 SMU L.Rev. at pp. 1354-1355.)
For decades, commentators have rejected similarity as an adequate criterion of connection or relatedness, recognizing that its excessive breadth would create jurisdiction in every state for every breach by a national corporation, wherever it occurred. ‘“Thus the similarity test would apparently have to allow jurisdiction in any State in the country where the defendant has engaged in similar activities.” (Brilmayer, How Contacts Count: Due Process Limitations on State Court Jurisdiction (1980) Sup.Ct.Rev. 77, 84; accord, Rhodes & Robertson, Toward a New Equilibrium in Personal Jurisdiction (2014) 48 U.C. Davis L.Rev. 207, 242 [allowing specific jurisdiction “in every forum in which the defendant conducts continuous and systematic forum activities that are sufficiently similar to the occurrence in dispute . . . would give the plaintiff the choice of essentially every state for proceeding against a national corporation”].) Today, the majority, by holding the presence of California plaintiffs with claims similar to those of real parties in interest constitutes a substantial connection between real parties’ claims and BMS’s California activities, effectively sanctions California courts taking jurisdiction over actions by plaintiffs throughout the nation alleging injuries from any nationwide business activity.
As California holds a substantial portion of the United States population, any company selling a product or service nationwide, regardless of where it is incorporated or headquartered, is likely to do a substantial part of its business *836 in California. Under the majority’s theory of specific jurisdiction, California provides a forum for plaintiffs from any number of states to join with California plaintiffs seeking redress for injuries from virtually any course of business conduct a defendant has pursued on a nationwide basis, without any showing of a relationship between the defendant’s conduct in California and the nonresident plaintiffs’ claims. The majority thus sanctions our state to regularly adjudicate disputes arising purely from conduct in other states, brought by nonresidents who suffered no injury here, against companies who are not at home here but simply do business in the state.
Such an aggressive assertion of personal jurisdiction is inconsistent with the limits set by due process. Although those limits are more flexible and less strictly territorial than in the past, the high court has explained that they still act to keep any one state from encroaching on the others: ‘“[W]e have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution.” (World-Wide Volkswagen, supra, 444 U.S. at p. 293.) That BMS marketed and sold Plavix throughout the United States, presumably using much of the same advertising in many markets, does not give California authority, under our federal system, to assert jurisdiction over claims arising throughout the nation. Speaking of the limits to jurisdiction set by interstate federalism, the court in Boaz—also involving a pharmaceutical drug marketed throughout the nation—observed: ‘“We have no warrant to jettison these principles in favor of an approach which recognizes no defined limits to the assertion of jurisdiction against any defendant whose national marketing somehow affects commerce in the forum state.” (Boaz, supra, 40 Cal.App.4th at p. 721.)
Assessing the fairness of specific jurisdiction “ ‘in the context of our federal system of government’ ” (World-Wide Volkswagen, supra, 444 U.S. at pp. 293-294), we should be restrained here by the absence of any discernable state interest in adjudicating the nonresident plaintiffs’ claims. Where the conduct sued upon did not occur in California, was not directed at individuals or entities in California, and caused no injuries in California or to California residents, neither our state’s interest in regulating conduct within its borders (Vans, supra, 14 Cal.4th at p. 472) nor its interest in providing a forum for its residents to seek redress for their injuries {id. at p. 473) is implicated. On the critical question of why a Texan’s claim he was injured in Texas by taking Plavix prescribed and sold to him in Texas should be adjudicated in California, rather than Texas (or in Delaware or New York, BMS’s home states), the majority offers no persuasive answer.
*837 Conclusion
Like the majority, I conclude BMS, despite its significant business activities in California, is not at home in our state for purposes of asserting general personal jurisdiction over it. But neither, in my view, is specific jurisdiction over the nonresident plaintiffs’ claims proper. No substantial connection has been shown between BMS’s activities in California and the nonresidents’ claims, which arose out of BMS’s marketing and sales of Plavix in other states.
For this reason, I respectfully dissent.
Chin, J., and Corrigan, J., concurred.

 As to the California resident, the Boaz court reasoned jurisdiction was lacking because her grandmother had not taken DES in California and therefore “any DES-related affliction she suffers has nothing to do with any of Emons’s activities related to California.” (Boaz. supra. 40 Cal.App.4th at p. 718.) The court may have gone too far in this respect; California’s interest in providing a forum for its residents to seek redress for actions having injurious effects in the state arguably justified specific jurisdiction over the California resident’s claims. For the same reason. In re DES Cases (E.D.N.Y. 1992) 789 F. Supp. 552 can be distinguished as involving the claims of New York residents seeking a remedy for injuries occurring in New York; although the defendants challenging jurisdiction there did not market DES in New York, they bore legal responsibility for injuries there under the state’s rule of market share liability. (See id. at pp. 592-593.)

 The majority (maj. opn., ante, at p. 805) notes that the defendant in Boaz. unlike BMS, did not employ salespeople or maintain offices in the state. Yet through “advertising in selected professional magazines and professional journals, and targeted mailings of samples and brochures to obstetricians and gynecologists,” all “done on a national scale” (Boaz. supra. 40 Cal.App.4th at p. 715), the company sold a large amount of DES—the same product at issue in the disputed lawsuits—in California. Like BMS, then, the defendant in Boaz “enjoyed sizeable revenues from the sales of its product here.” (Maj. opn., ante, at p. 806.) Why the absence of other, dissimilar ties should serve to distinguish the case is unclear.

 See In re Plavix Marketing, Sales Practices and Products Liability Litigation (No. II) (J.P.M.L. 2013) 923 F.Supp.2d 1376, 1379-1381 (centralizing in District of New Jersey litigation arising in that state and in Illinois, Iowa, Louisiana, New York, and Pennsylvania, and potentially centralizing additional actions from California and Mississippi); Mills v. Bristol-Myers Squibb Co. (D.Ariz., Aug. 12, 2011, No. CV 11-968-PHX-FJM) 2011 WL 3566131, p. *1 (individual action); Hawaii ex rel. Louie v. Bristol-Myers Squibb Co. (D.Hawaii, Aug. 5, 2014, Civ. No. 14-00180 HG-RLP) 2014 WL 3865213, p. *2 (parens patriae action brought by the Attorney General of Hawaii remanded to state court); Davidson v. Bristol-Myers Squibb Co. (S.D.Ill., Apr. 13, 2012, Civ. No. 12-58-GPM) 2012 WL 1253165, p. *5 (action by 83 plaintiffs remanded to state court); Boyer v. Bristol-Myers Squibb Co. (S.D.Ill., Apr. 13, 2012, Civ. No. 12-61-GPM) 2012 WL 1253177, p. *5 (same, as to action by 71 plaintiffs); Anglin v. Bristol-Myers Squibb Co. (S.D.Ill., Apr. 13, 2012, Civ. No. 12-60-GPM) 2012 WL 1268143, p.*5 (same, as to action by 67 plaintiffs); Tolliver v. Bristol-Myers Squibb Co. (N.D.Ohio, July 30, 2012, No. 1:12 CV 00754) 2012 WL 3074538, p. *1 (individual action); Employer Teamsters-Local Nos. 175/505 Health and Welfare Trust Fund v. Bristol-Myers Squibb Co. (S.D.W.Va. 2013) 969 F. Supp. 2d 463, 466 (action by third party payors alleging misleading and false marketing of Plavix).

 The majority’s account of Hanson as resting solely on the purposeful availment prong of the specific jurisdiction test (maj. opn., ante, at p. 805, fn. 3) is incomplete. The trust settlor in Hanson had moved to Florida after establishing the trust; the trustee then paid the settlor trust income in that state and received from her directions for trust administration, including the execution of two powers of appointment. (Hanson, supra. 357 U.S. at p. 252 & fn. 24.) But because the litigation concerned the validity of the trust agreement itself (id. at p. 253), the cause of action was “not one that arises out of an act done or transaction consummated in the forum State.” (Id. at p. 251.) Hanson’a holding was thus based on the lack of a relationship between the litigation and the defendant’s forum contacts as well as on the paucity of those contacts.

 Despite relying on BMS’s nationwide marketing of Plavix as a basis for jurisdiction, and despite bearing the burden of proof on contacts and relatedness, real parties in interest introduced no evidence of particular marketing materials or broadcasts deployed in any state.

 This is not a matter of the absence of evidence. In support of its motion to quash service, a BMS executive submitted a declaration stating that “none of the work to develop Plavix took place in California,” and that all development, manufacture, labeling, and marketing of Plavix was performed or directed from New York or New Jersey; none was accomplished or directed by California employees.

 In Insurance Corp. v. Compagine des Bauxites (1982) 456 U.S. 694, 703, footnote 10 [72 L.Ed.2d 492, 102 S.Ct. 2099], the high court noted that concern for federalism is not “an independent restriction on the sovereign power of the court,” but rather “a function of the individual liberty interest preserved by the Due Process Clause,” waivable by the party. Though not an independent, unwaivable restriction on jurisdiction, interstate federalism remains an important consideration in determining how the due process limits on jurisdiction should be applied. “The defendant has a due process right to have states act only within the limits of their' sovereignty.” (Andrews, supra. 58 SMU L.Rev. at p. 1347.)